IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARVIN L. BROWN JR., | |
| Plaintiff, | 8:16CV217 |
| vs. | |
| ROBERT HOUSTON, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

This matter is before the court on Defendants' Motion for Summary Judgment.* (Filing No. 66). For the reasons that follow, the Motion is granted.

## I. BACKGROUND

Plaintiff Marvin Brown, Jr. ("Brown"), an inmate within the custody and control of the Nebraska Department of Correctional Services ("NDCS"), filed this action against Defendants NDCS and its administrators and medical staff, asserting violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., as amended ("ADA"), based on Defendants' alleged refusal to accommodate his immobility caused by his knee and back problems during his incarceration. (Filing No. 21.) He alleges that Defendants' failure to provide accommodations prevented him from participating in church, school, self-help betterment programs, treatment, parenting classes, ADA privileged activities, and recreational yard time. (*Id.* at CM/ECF p. 3.) The court allowed Brown's failure-to-accommodate claim under Title II of the ADA for injunctive relief and money damages to proceed against Defendants in their official capacities.[1] (Filing No. 22.)

---

* Due to technical issues caused by the length of the footnotes in this Memorandum and Order, endnotes are used instead of footnotes.

## II. RELEVANT UNDISPUTED MATERIAL FACTS

The court's local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." This statement of facts "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." NECivR 56.1(a). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "state the number of the paragraph in the movant's statement of material facts that is disputed" and must contain pinpoint citations to evidence supporting the opposition. *Id. See also* NECivR 7.1(b)(2)(A) ("When filing the opposing brief, the opposing party must also file and serve supporting evidentiary material not previously filed."). "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1). *See also* Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

As a pro se litigant, Brown is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g). *See also Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (per curiam) (concluding pro se litigants are not excused from compliance with procedural and local rules).

Defendants have submitted a statement of material facts in accordance with the court's Local Rules and properly authenticated evidence. Brown has not submitted a brief containing a concise response to Defendants' statement of material facts as required by NECivR 56.1(b)(1). Instead, he filed an affidavit (Filing No. 75), contesting several of Defendants' facts. In addition to the exhibits filed with his Complaint and Supplemental Complaint, Brown also submitted

exhibits (Filing No. 76) in support of his affidavit. The court will consider Brown's affidavit and exhibits.[2]

Upon careful review, the court finds that the following material facts, as stated in Defendants' brief, are fully supported by the evidence cited and have not been controverted by Brown. Consequently, they are deemed admitted for purposes of summary judgment. *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(e)(2).

1. Brown was, at all times relevant to this action, an inmate incarcerated within facilities under the control of NDCS. (Filing No. 1 at CM/ECF p. 10, ¶ 1, p. 15, ¶ 16.)

2. On March 30, 2010, Brown was received into the custody of NDCS and reported that he was unable to climb stairs due to a rod in his ribs and screws in his knee. Medical staff noted that they had received all the medical records from Lancaster County and that Brown had no restrictions at the Lancaster County Jail.[3] (Filing No. 18 at CM/ECF pp. 38, 48.)

3. On April 7, 2010, Brown requested a lower bunk restriction; he received a temporary lower bunk pass for fourteen days on April 8, 2010. (Filing No. 18 at CM/ECF p. 49; Filing No. 18-1 at CM/ECF p. 1.)

4. On April 15, 2010, Brown was seen by NDCS physician's assistant Cheryl Flinn ("Flinn") regarding right knee swelling. He told Flinn that he had had a disability evaluation in 2008 and was told not to use stairs.[4] Flinn noted in Brown's medical records that she found this information hard to believe. She further noted that he had no restrictions per medical at the Lancaster County Jail. (Filing No. 18-1 at CM/ECF p. 5.)

5. On April 22, 2010, Brown's x-ray results were received and they showed a small amount of fluid on his knee and minor arthritis. (Filing No. 18-1 at CM/ECF p. 10.)

6. Medical guidelines for individuals with arthritis are to stay active in order to prevent a decrease in function and to help ease pain. ([Filing No. 68-1 at CM/ECF p. 2](), ¶ 9.)

7. On April 25, 2010, Brown requested a permanent lower bunk pass and was told that fluid on the knee and minor arthritis "is not a medical condition" that requires a permanent lower bunk pass.[5] ([Filing No. 18-1 at CM/ECF p. 11]().)

8. On April 27, 2010, Brown was given a temporary bottom bunk pass and sports restriction for one month only. ([Filing No. 18-1 at CM/ECF p. 12]().)

9. On May 9, 2010, Brown again requested an extension of his bottom bunk pass.[6] Medical staff extended his bunk pass for one month, but explained that knee pain does not require a permanent bottom bunk pass. ([Filing No. 18-1 at CM/ECF p. 14]().)

10. On May 30, 2010, Brown refused the use of crutches as indicated by medical staff.[7] ([Filing No. 18-1 at CM/ECF p. 25]().)

11. On June 7, 2010, the medical staff at NDCS reviewed records sent from Lancaster County. These records revealed that: Brown could play in the gym without difficulty; he was given the ok to work but was not supposed to stand for long periods of time; he did not return for follow up care; and medical staff at the jail had denied him a lower bunk pass. ([Filing No. 18-1 at CM/ECF p. 25]().)

12. On September 9, 2010, Brown's medical records from NDCS reveal that he was seen and approved for a top bunk. ([Filing No. 18 at CM/ECF p. 30]().) On this same date, an LPN wrote in Brown's medical file that, based on past medical records, a current assessment, and staff observations, an ADA cell was not indicated. ([Id. at CM/ECF p. 31]().)

13. On September 22,[8] 2010, the Ombudsman's office wrote Brown a letter in response to complaints Brown had made regarding his sleeping arrangements at the Lincoln Correctional Center ("LCC"). The Ombudsman's office indicated to Brown that they had not made a formal request to the ADA coordinator for an ADA cell. They indicated to Brown that when they compared the medical records from Nebraska Orthopaedic and the records provided by Brown, it appeared that the records from Brown had been altered and were incomplete. The Ombudsman's office further stated that they had learned from medical staff at NDCS that Brown's physical condition had improved from 2009 to 2010 and that they were working with him on exercises to maintain muscle strength and tone in both legs. ([Filing No. 18 at CM/ECF pp. 41-42](#).)

14. In 2010, 2011, and 2012, while housed at the LCC, Brown was given medical accommodations that were medically indicated for his physical condition, which was determined by physical examinations, self reporting, and reports from correctional staff. ([Filing No. 68-1 at CM/ECF p. 2](#), ¶ 10.)

15. In 2010, 2011, and 2012, while housed at the LCC, Brown was observed multiple times navigating stairs in his housing unit without difficulty, participating in basketball and other recreational activities on the yard which included bending and squatting, ambulating to and from meals without difficulty, and ascending and descending his bunk without difficulty. ([Filing No. 68-1 at CM/ECF pp. 1-2](#), ¶7.)

16. In April 2017, Brown was transferred from the Tecumseh State Correctional Institution ("TSCI") back to the LCC. ([Filing No. 68-2 at CM/ECF p. 1](#), ¶ 5.)

17. When Brown arrived at the LCC, it was noted on his NDCS Medical Transfer Sheet from the TSCI that he was to have a pass for a lower bunk assignment. This pass was continued at the LCC. ([Filing No. 68-2 at CM/ECF p. 1](#), ¶ 6.)

18. Dan Danaher ("Danaher"), a physician's assistant at the LCC, saw Brown on a routine sick call on May 4, 2017, per Brown's request. At this visit, Brown and Danaher discussed his long history of knee problems, pain, and physical limitations. ([Filing No. 68-2 at CM/ECF p. 1](), ¶ 7.)

19. At this appointment, Danaher authorized the following limitations for Brown: prolonged standing (over 1 hour), no recurrent bending/stooping, no lifting greater than 20 pounds, no squatting, no sports or weight lifting. Danaher also issued Brown an updated bottom bunk pass and a spine pass for movement. The spine pass allows Brown to get to the school, the religious center, the gym and classes without navigating any hills or stairs apart from the stairs in his housing unit. Brown was agreeable with these accommodations. ([Filing No. 68-2 at CM/ECF p. 2](), ¶ 9.)

20. At a May 11, 2017, clinic visit, Brown told Danaher that he was assigned to a bottom tier and was doing well. He requested to stay on the bottom tier and stated that he was able to ambulate the stairs in the unit and use the handrails on the yard as needed. ([Filing No. 68-2 at CM/ECF p. 1](), ¶ 8.)

21. On June 1, 2017, medical added an additional limitation: no ambulation on uneven ground. ([Filing No. 68-2 at CM/ECF p. 2](), ¶ 11.)

22. Both the bottom tier and top tier cells at the LCC are accessed by stairs. Danaher has observed Brown ambulating stairs on the unit, without using the handrails, without difficulty. ([Filing No. 68-2 at CM/ECF p. 2](), ¶ 12.)

23. If an inmate at the LCC is observed by staff having trouble with stairs, or personally reports having trouble ambulating stairs, the inmate would be assessed by medical staff who would determine what accommodations were appropriate. Or, the inmate may be assigned to the Diagnostic and Evaluation Center Skilled Nursing Facility for further assessment. If medical staff determine the inmate cannot ambulate stairs, the inmate would either remain in the Skilled

Nursing Facility or be recommended for assignment to a housing unit without stairs. ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 13.)

24. Danaher does not recall any reports from Brown or housing unit staff that Brown had difficulty ambulating stairs.[9] ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 14.)

25. Brown has a lower bunk pass; therefore, he does not have to climb a ladder to get into a top bunk. If an inmate has a permanent medical condition such as a seizure disorder or limb amputation, they may receive a permanent bottom bunk pass. If an inmate has a musculoskeletal or medical condition that could change over time, they could receive a temporary lower bunk pass which would be reevaluated as appropriate. ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 15.)

26. When Danaher met with Brown on May 11, 2017, he stated he was doing well with his current living situation and accommodations. He did not ask for any further accommodations such as a shower chair or railings in his assigned cell. If an inmate requested such accommodations, or if staff thought an inmate may require such accommodations, the inmate would be medically assessed and a determination made regarding specific accommodations. ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 16.)

27. Brown has not requested any additional accommodations from what he already has since he arrived at the LCC in April 2017. ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 16.)

### III. ANALYSIS

**A. Standard of Review**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotations omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

**B. Failure-to-Accommodate Claim under Title II of the ADA**

Brown claims that he was denied reasonable accommodation of his physical impairments, in violation of Title II of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

8

subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" under this provision includes state prisons, and "services, programs, or activities" includes medical care. *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). Title II requires that "'qualified individual[s] with a disability' are entitled to 'meaningful access' to such benefits." *Mason*, 559 F.3d at 886 (quoting *Randolph v. Rodgers*, 170 F.3d 850, 857-58 (8th Cir. 1999)). To establish a violation of Title II, Brown "must specify a benefit to which he was denied meaningful access based on his disability." *Mason*, 559 F.3d at 888 (citing 42 U.S.C. § 12132).

The type of discrimination under the ADA that is relevant to this case is failure to make reasonable accommodations. *See Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004) (comparing claims and the differing burdens of production and persuasion); Filing No. 20 at CM/ECF pp. 9-10. In a failure-to-accommodate claim under the ADA, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. . . . The known disability triggers the duty to reasonably accommodate and, if the [defendant] fails to fulfill that duty, we do not care if he was motivated by the disability." *Peebles*, 354 F.3d at 767. *See also Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1040 (N.D. Iowa 2011) (failure to accommodate is an independent basis for liability under the ADA, but accommodation is only required when necessary to avoid discrimination on the basis of disability, and accommodation must be reasonable (citing 28 C.F.R. § 35.130(b)(7)).

In order to establish that Defendants violated Title II of the ADA, Brown must show "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010); *see also Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013); *Randolph*, 170 F.3d at 858. To recover compensatory damages, Brown must prove

9

discriminatory intent, which can be shown by Defendants' deliberate indifference to Brown's rights under the ADA—specifically, Defendants' "deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation and citation omitted).

"[D]eliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" may constitute a violation of Title II. *Georgia*, 546 U.S. at 157; *see also Phipps v. Sheriff of Cook Cnty.*, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) (collecting cases holding that "showering, toileting, and lavatory use [are] regarded as programs and/or services under the ADA"); *Maxwell v. Olmsted Cnty.*, No. CIV. 10-3668, 2012 WL 466179, at *4 (D. Minn. Feb. 13, 2012) ("If [plaintiff] in fact made requests for accessible bathing facilities, and those requests went unanswered by the [detention center], he was denied access to a fundamental service or benefit under Title II."); *Allen v. Morris*, No. 4:93CV00398, 2010 WL 1382112, at *8 (E.D. Ark. Jan. 6, 2010), *report and recommendation adopted*, No. 4:93CV00398, 2010 WL 1382116 (E.D. Ark. Apr. 2, 2010) (considering, and allowing to go forward, claim that prison's failure to make reasonable accommodations that would enable obviously disabled plaintiff to safely shower constituted discriminatory intent under Title II of the ADA); *Muhammad v. Dep't of Corr.*, 645 F. Supp. 2d 299, 314 (D.N.J. 2008), *aff'd sub nom. Muhammad v. NJ Dep't of Corr.*, 396 F. App'x 789 (3d Cir. 2010) ("the transfer of Plaintiff, apparently without penological justification, to a cell which was painful for him to access and which had restricted access to the handicapped-accessible shower, when a reasonable accommodation appears to have been readily available, is sufficient to state a claim under Title II [of the ADA]" (internal quotation and citation omitted)).

Of course, the right to reasonable accommodations is not absolute. *See Sak*, 832 F. Supp. 2d at 1040 (failure to accommodate is an independent basis for liability under the ADA, but accommodation is only required when necessary to

10

avoid discrimination on the basis of disability, and accommodation must be reasonable (citing 28 C.F.R. § 35.130(b)(7)). Correctional facilities are not liable for failing to provide accommodations which were not requested, nor are they required to provide preferential treatment to disabled inmates. *Randolph*, 170 F.3d at 858; *Lue v. Moore*, 43 F.3d 1203, 1206 (8th Cir. 1994). Moreover, a defendant may defeat a Title II claim by "demonstrat[ing] that the requested accommodation would constitute an undue burden." *Randolph*, 170 F.3d at 858.

Defendants do not dispute—and, for purposes of this Motion, the court will assume—that Brown is a "qualified individual with a disability" under Title II of the ADA. The question here is whether Defendants failed to provide Brown accommodations such that he was, "by reason of" his disability, "excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail." *Baribeau*, 596 F.3d at 484.

Brown claims Title II violations due to Defendants' failure to provide him with (1) a living arrangement without stairs; (2) a lower tier cell and a bottom bunk; (3) medical railings or steps to navigate his cell and to use the toilet; (4) a shower seat; and (5) railings or steps to navigate up and down off the bed and floor. (Filing No. 21 at CM/ECF p. 2.) He claims that Defendants' failure to provide these accommodations caused him "immense pain" and prevented him from participating in church, school, self-help betterment programs, treatment, parenting classes, ADA privileged activities, and recreational yard time, which required him to navigate stairs and/or hills. (*Id.* at CM/ECF p. 3 (spelling corrected).)

The undisputed evidence demonstrates that Brown has received all medically indicated accommodations while incarcerated within the custody and control of NDCS. Specifically, the evidence shows that, when Brown was received into the custody of NDCS, he did not have any medical restrictions from the previous facility. Nonetheless, in response to Brown's complaints that being in a

top bunk or "tub" bed and in an upper-tier cell aggravated his already painful knee and back condition, Defendants provided him with a lower bunk pass or cell reassignment.[10] The evidence also establishes that Brown currently has a lower bunk assignment ([Filing No. 76 at CM/ECF p. 15](#)) and a spine pass (*[id.* at CM/ECF p. 16](#)), which allows him to travel to school, the religious center, and the gym without having to navigate stairs or hills. With respect to Brown's request for a living arrangement without stairs, the evidence indicates that both lower and upper tier cells at the LCC have stairs. However, the October 25, 2017, notice of limited activity instructs that Brown not be assigned to "upper tier housing" in order "to limit amount of stairs." (*[Id.](#)*) Brown has been observed ambulating the stairs without difficulty and without using the provided handrail. There is no evidence, beyond Brown's own allegations,[11] that he has complained to his current facility—the LCC—about having to use the stairs. To the contrary, the evidence shows that, in May 2017, Brown reported to Danaher, a physician's assistant at the LCC, that he was doing well and was able to ambulate the stairs in the housing unit and use the handrails on the yard as needed. There is no evidence that Brown has since requested additional accommodations, such as a shower chair or railings in his assigned cell, from LCC medical staff.

To the extent Brown claims that Defendants have failed to accommodate his physical ailments by not providing him a permanent bottom bunk pass, the evidence demonstrates that only inmates with a permanent medical condition, such as a seizure disorder or limb amputation, may receive a permanent bottom bunk pass. ([Filing No. 68-2 at CM/ECF p. 2](#), ¶ 15.) It is undisputed that Brown does not suffer from these types of medical conditions. Rather, the evidence indicates that Brown suffers from a musculoskeletal or medical condition that changes over time. As such, Brown receives temporary lower bunk passes which are reevaluated as appropriate. (*[Id.](#)*)

Brown also fails to submit any evidence supporting his claims that, because of the lack of additional accommodations, he is unable to attend classes, school, church, treatment, recreational yard time, and other activities because he has to

climb stairs and/or hills. Rather, the evidence shows that Brown has been provided with a spine pass, which allows him access to classes and the yard without navigating stairs or hills, except the stairs in his housing unit. The September 2017 daily activities and services log reflects that Brown participated in recreational yard time eighteen out of the twenty times it was offered. ([Filing No. 68-3](#).) There is no evidence supporting Brown's allegations that he has been unable to attend church, school, self-help betterment programs, treatment, or parenting classes.

In sum, there is no evidence that Brown has requested a medically indicated accommodation for his physical impairments and has been denied that accommodation. To the contrary, the evidence demonstrates that Brown was, and currently is, provided with appropriate medically indicated accommodations, including a spine pass, a lower bunk pass, and lower tier cell assignment. Brown has not requested any additional accommodations since he retuned to the LCC in April 2017. The evidence shows that he is able to participate in recreational yard time, and there is no indication that he is unable to attend church, school, self-help betterment programs, treatment, or parenting classes. Nor is there any evidence showing a correlation between the additional accommodations Brown identifies in his Supplemental Amended Complaint (such as a shower seat, medical railings throughout the cell, and grab bars by the toilet), and his ability to attend classes, church, treatment, or participate in recreational yard time.[12]

Accordingly, the court finds that there is no evidence that Defendants failed to provide Brown medically indicated accommodations in violation of Title II of the ADA. Defendants' Motion for Summary Judgment is granted, and Brown's claims for injunctive relief and money damages are dismissed.

In light of the court's order granting summary judgment in favor of Defendants, Brown's Motion to Reconsider Appointment of Counsel ([Filing No. 80](#)) is denied.

IT IS THEREFORE ORDERED that:

1. Defendants' Motion for Summary Judgment ([Filing No. 66](#)) is granted.

2. A separate judgment will be entered.

3. Plaintiff's Motion to Reconsider Appointment of Counsel ([Filing No. 80](#)) is denied.

Dated this 13th day of March, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge

# ENDNOTES

1. Brown's Supplemental Amended Complaint ([Filing No. 21](Filing No. 21)) is considered supplemental to Brown's Complaint ([Filing No. 1](Filing No. 1)) and Supplemental Complaint ([Filing No. 18](Filing No. 18)). ([Filing No. 20 at CM/ECF p. 14](Filing No. 20 at CM/ECF p. 14), ¶ 4.)

2. One of the exhibits is a copy of a portion of Defendants' statement of material facts with handwritten objections to certain facts. ([Filing No. 76 at CM/ECF pp. 12-13](Filing No. 76 at CM/ECF pp. 12-13).) These objections do not comply with the Local Rules, and the court will not consider them.

3. Brown disputes that he had no restrictions at the Lancaster County Jail, citing to a Lancaster County Jail progress note dated August 27, 2009, which states: "Ok to lodge lower level lower bunk." ([Filing No. 75 at CM/ECF p. 1](Filing No. 75 at CM/ECF p. 1), ¶ 1; [Filing No. 76 at CM/ECF p. 3](Filing No. 76 at CM/ECF p. 3).) That the Lancaster County Jail approved Brown for a bottom bunk on the lower level does not establish that he was medically restricted to those lodging arrangements. Furthermore, even assuming it was a medical restriction, it does not alter subsequent medical opinions and recommendations of employees of NDCS.

4. Brown denies telling Flinn that he was told not to use stairs. ([Filing No. 75 at CM/ECF at pp. 1-2](Filing No. 75 at CM/ECF at pp. 1-2), ¶ 2.) In support, he cites to Lancaster County Jail progress note dated March 9, 2010 ([Filing No. 76 at CM/ECF p. 6](Filing No. 76 at CM/ECF p. 6)), and NDCS patient questionnaire and health history form dated March 30, 2010 (*[id. at CM/ECF at p. 7](id. at CM/ECF at p. 7)*), in which he says he "did not state such things." ([Filing No. 75 at CM/ECF at p. 2](Filing No. 75 at CM/ECF at p. 2), ¶ 2.) These medical records ([Filing No. 76 at CM/ECF pp. 6-7](Filing No. 76 at CM/ECF pp. 6-7)) are not relevant to what Brown told Flinn on April 15, 2010. Moreover, because these medical records do not indicate that Brown was told not to use stairs, they support, rather than contradict, Flinn's observation that it was "hard to believe" Brown was told not to use stairs.

5. Brown contests that he requested a "permanent" lower bunk pass. ([Filing No. 75 at CM/ECF p. 2](Filing No. 75 at CM/ECF p. 2), ¶ 3.) He asserts that the inmate interview request ([Filing No. 76 at CM/ECF p. 10](Filing No. 76 at CM/ECF p. 10)) "clearly indicates that he is not asking for a bottom bunk pass [but] only to have the pass reinstated so [he] wouldn't be placed in his prior living conditions as he was and experienced at the NDCS Lincoln Diagnostic Evaluation Center." ([Filing No. 75 at CM/ECF p. 2](Filing No. 75 at CM/ECF p. 2), ¶ 3 (capitalization & punctuation corrected).) There are two inmate interview requests dated April 25, 2010. In the first request (referenced in paragraph 7 of Defendants' statement of material facts), Brown notes that his fourteen-day bottom bunk pass expires on

April 28, 2010, and states that he "need[s] a longer existing bottom bunk pass." ([Filing No. 18-1 at CM/ECF p. 11](#) (capitalization corrected).) In his opposition affidavit, Brown does not reference this April 25, 2010 request; rather, he references the second April 25, 2010, request ([Filing No. 76 at CM/ECF p. 10](#)), which appears to be a follow-up to, or clarification of, the first request. In that April 25, 2010, request, Brown states that he is "not asking for a permanent lower bunk pass," but simply for an extension of the lower bunk pass. (*Id.* (capitalization & punctuation corrected).) Arguably, the first April 25, 2010 request ([Filing No. 18-1 at CM/ECF p. 11](#)) for a "longer" lower bunk pass could be construed as a request for a permanent lower bunk pass. However, resolution of whether the request was for a "permanent" lower bunk pass or simply an extension of the existing lower bunk pass is unnecessary because it does not affect the outcome of the lawsuit.

      6.    Defendants state that Brown requested a "permanent" bottom bunk pass. ([Filing No. 67 at CM/ECF p. 3](#), ¶ 9.) A review of Brown's May 9, 2010, medical request reflects that Brown requested an extension of his lower bunk pass "so that the next institution will be aware of the matter," but he did not specifically use the term "permanent." ([Filing No. 18-1 at CM/ECF p. 14](#) (capitalization corrected).) Nonetheless, this is a distinction without a difference because it does not affect the outcome of the lawsuit.

      7.    Brown contests this allegation, stating that he "does not recall or remember such event" ([Filing No. 75 at CM/ECF p. 3](#), ¶ 4 (capitalization corrected).) Brown's memory lapse does not qualify as competent evidence to dispute what is written in the medical record. Brown then argues that there "is no mention of crutches" in the March 30, 2010, sick call report. (*Id.*) Brown identified this medical report as Exhibit #4, but Exhibit #4 of the exhibits ([Filing No. 76](#)) filed in support of his opposition affidavit is not a medical record. In any event, that there was no mention of crutches in a March 30, 2010, sick call report, taken as true, does not contradict or create a genuine issue of disputed material fact that, on May 30, 2010, Brown refused the use of crutches.

      8.    Defendants identified the letter date as September 10, 2010 ([Filing No. 67 at CM/ECF p. 3](#), ¶ 13), instead of September 22, 2010 ([Filing No. 18 at CM/ECF p. 41](#)). This typographical error does not affect the substance of the letter.

      9.    Brown disputes this allegation. ([Filing No. 75 at CM/ECF pp. 3-4](#), ¶ 5.) He states that Danaher received "many reports" from Brown "about ambulation of stair, movement and mobility" and cites to "incorporated exhibits # (4)," which he describes as the April 2017, May 4, 2017, and May 11, 2017, medical visits

with Danaher. (*Id.* (capitalization corrected).) The exhibits (Filing No. 76) filed in support of his opposition do not include these medical visits. Thus, Brown has failed to present competent evidence to dispute Defendants' allegation.

10. *See, e.g.*, Filing No. 1 at CM/ECF p. 67 (lower bunk assignment for 14 days); Filing No. 1 at CM/ECF p. 81 (lower bunk assignment renewed for 30 days); Filing No. 1-1 at CM/ECF pp. 33-34 (Brown permanently reassigned to low bunk); Filing No. 1-1 at CM/ECF p. 40 (Brown transferred to medical module and cell per Dr. Harris's recommendation); Filing No. 1-4 at CM/ECF p. 14 (Brown given bottom bunk pass and assigned to bottom-tier cell with hand rail in toilet area).

11. There is evidence that Brown has not always been honest regarding his disability and that he has altered medical records.

12. The court trusts that Brown will contact medical staff pursuant to his institution's normal procedures if he has further difficulty ambulating stairs or accessing fundamental institutional programs, services, or activities. Medical staff can then determine what, if any, accommodations are appropriate and if Brown should be assigned to the Diagnostic and Evaluation Center Skilled Nursing Facility for further assessment.